May it please the court, your honors, George Carpinello, Boies, Shiller, and Flexner for the appellant plaintiff. Your honors, the district court committed numerous errors of law which require reversal in this case. Perhaps most importantly, the judge misconstrued the standard for determining implied certification and held that the plaintiff had waived express certification. In the intervening time since the district court issued its decision, the Supreme Court, of course, issued its Escobar decision which held, most importantly, that you need not show, plaintiff, relate or need not show that there was a statute which expressly conditioned payment of the contract on compliance with that regulation. So clearly, the district court in holding that was wrong and committed an error of law. And at the very least, should the court find that the complaint is in any way deficient here, should allow us to go back and plead in accordance strictly with the Escobar standards which we can clearly articulate. So Escobar also said that there had to be a showing that it was material to the government's payment decision. And one of the counterexamples was if the government pays a particular claim in despite of its actual knowledge that certain requirements were violated, there is strong evidence that those requirements are not material. And contrarily, they said, well, is there evidence that the government consistently refuses to pay claims in the mine run of cases? Yes. So help me understand how that there was evidence in the record to support materiality. I neglected to add, Your Honor, that I wish to reserve three minutes of my time for rebuttal. I apologize. Okay. Please watch the clock. So with regard to materiality, Escobar said that the government's reaction is evidence. It is not determinative. And the First Circuit on remand from Escobar made the point that you have to do a holistic examination and what the government does is relevant. In this case, of course, the government told WEDC when they learned of the violations by MicroSemi to pull the plug, literally pull the plug. And MicroSemi only made their purported disclosures after DSS told them of what they believed to be a violation. So the government's actions here clearly felt that this was clearly an important issue. The fact that the government allowed payments to continue on the contracts after learning of it is not determinative. It's not determinative, but it's evidence. And so what is the evidence that in the mine run of cases the government will not pay in this situation in the record? Well, we have several factors that show that the government fuses to be material. First of all, parties who violate these regulations are subject to debarment. They're subject to debarment. Was there evidence in the records in the mine run of cases of this sort? Yes. Where there was potential access but no evidence of deliberate sending information that the government debars those people? Yes. In fact, there's actually, and we can provide it, Your Honor, the Department of Justice issued a summary of criminal prosecutions involving this, and they actually criminally prosecuted an individual who carried a computer outside the United States without evidence of having a foreign national viewing it. And, of course, so with regard to materiality, it's clear that this is, Escobar says the regulation has to be central to the statutory scheme and not technical or insubstantial. Clearly, compliance with the national security laws is central, integral to the procurement of Defense Department materials. All the products that are affected here are extremely sensitive government, for example, GPS guidance for missiles, electronics that allow an individual who's behind enemy lines to be located by the United States Army, the Air Force. All these technologies were open to thousands of people in 18 countries, including China, because MicroSemi decided they wanted to use one server, which was accessible to the entire company. So what were the specific allegations in the First Amendment complaint that support your client's conclusion that compliance with expert control laws was material to payment? What were the allegations in the First Amendment complaint? Well, first of all, the materiality, there's no evidence yet that the government made any decision to suspend payment in this particular case. Certainly, the government could have done that, and there's no evidence they did because MicroSemi, as we allege in the complaint, lied to the government about what had happened. They claimed to the government that it was a short-term thing. They claimed only three people were potentially exposed. They claimed none of the three people actually viewed it, and they concluded that, and they said they solved the problem after a very short period of time. So there was no suspension. But clearly the government, by virtue, clearly the regulations require, and the complaint specifically alleges that, first of all, it has to be in the contract. The DFAR regulations specifically provide that a contract for these products has to have within it that you will comply with these ITAR and EAR regulations. Second, we know that the contracts did have, and we gave examples of the Raytheon contracts, did have terms in it. Third, we know that the purchase orders from Raytheon specifically said, and they're attached as exhibits to the complaint, that you have to, you acknowledge by sending us the products and invoicing us that you've complied with those conditions. And fourth, the actual invoices from WEDC specifically say ITAR controlled. But I noticed you said you should be allowed to amend your complaint. What would you, what amendments would you make to your complaint? Well, we would specifically state, because we believe, we can assert in good faith that WEDC specifically certified to Raytheon that they had complied with the terms of the contract, which include compliance with ITAR. What are you going to add to the complaint to show materiality to the payment, to the government's payment? What specific allegations are you going to add? Well, the contract says that, the contract specifically says that you have to comply with this as a condition of the contract. And we. The court in ESCOBAR said that wasn't necessarily dispositive. There had to be evidence that the government, having full knowledge of this issue, would not pay. But let me ask you also, if you could address CENTER. That's the other place I'm having difficulty, based on opposing counsel's argument that the language of the regulation is ambiguous and the government has interpreted it in different ways. Well, there's no evidence the government has interpreted it in different ways. Clearly, the government has interpreted it. And the recent briefs filed by the U.S. government in the cases we cite in the briefs say, we have always and longstanding interpreted it to mean that giving access is enough to have committed an export. And the regulation clearly says, the regulation by its very terms clearly says that export includes sending or taking a defense article, an article includes data, out of the United States in any manner, and disclosing or transferring technical data to a foreign person. But I understand that disclosing is the word that is being questioned or being focused on and could mean, I guess the opposing counsel's argument is, in the context it indicates some active, some act, as opposed to the fact that was potentially accessible for the period of time. Well, disclosed is not defined in the statute. But by definition, disclosed means giving access to. And clearly that was done here. The allegations are quite clear that by putting it on the server accessible to all the users in 18 different countries, you were, in effect, disclosing it. And they can cite to no government interpretation that gives them cover. What they point to is in the preamble or in the 2016 rulemaking process, they said the act of providing physical access does not constitute an export. It requires a foreign person to view or access technical data as a result of being provided physical access. That's what they pointed to in the briefs. If you actually look at the regulation, and we cite it in our reply brief, and we trace the whole development of that, that's talking about giving access to encrypted data without giving the key to the encryption. And if you parse through the regulations, even in 2016, which, of course, are after the fact here, it's quite clear that no reasonable reading, you could argue that, for example, putting this data up on the Internet is not a violation unless you can prove that somebody actually looked at it, for obvious reasons. And, in effect, micro-semi-standing. Did they post this information on the Internet? I thought it was just that it was accessible to certain people in the company. Unauthorized foreign nationals. And we would submit it doesn't make any difference whether it's one person or a million people. What you did is exactly equivalent to putting it on the Internet because you've given access to foreign nationals who are not allowed to see it. And their argument is we couldn't have C-Enter. We couldn't have C-Enter because we read the regulation as it's not a violation until someone sees it. Okay. Is that a good faith justification for putting it up so someone can see it and you don't know whether they're going to see it or not? The whole argument is absurd. And as this Court pointed out, you have to have, you have to have, if you're going to argue that the regulation is unreasonable, you have to have a good faith belief. And the complaint sets out in chapter and verse and over several paragraphs that they were told by the relator and several other people time and time and time again that they were violating ITAR and EAR and they ignored it. They didn't ignore it because there was a disagreement in the regulations or interpretation. They ignored it because it was to their benefit. As they pointed out, it was cheaper to do, to have one server, and we don't want to, as one said, we don't want to delay the production of products because of your concern, because you're, quote, being paranoid. So they don't have the good faith belief. And I would cite U.S. Bourceau and Oliver v. Parsons and U.S. V. Chen, all of which hold that you have to have a good faith belief that your interpretation is correct. And the complaint clearly sets forth, and we're at a motion to dismiss stage, clearly sets forth that they did not have a good faith belief that they intentionally violated the ITAR. I would like to also point out that the court below interpreted all the facts in favor of micro-SEMI because the court made the error of saying because the complaint had referenced two letters from micro-SEMI and criticized them as being inaccurate, the district court said, I take the letters as true. Well, the case law is very clearly the opposite in this circuit. You don't take as true or take judicial notice of something referred in the complaint if it's contested by the plaintiff. You take the plaintiff's allegations as true. I see that my time has expired. I reserve three minutes. Thank you, Your Honor. Thank you. Thank you, Your Honor. May it please the Court, Theodore Olson on behalf of the respondents, micro-SEMI and White. The plaintiff's complaint is deficient as a matter of law in virtually every aspect of what is required to plead a violation of the False Claims Act. It is, he has not pleaded, properly pleaded a false claim, a specific standard, materiality, or scienter. The allegations, in fact, that are in the complaint defeat the claim itself and would be futile to permit any further amendment to this complaint. The complaint repeatedly, the courts have held that the complaint must plead plausibly and with specificity to overcome the burden that the plaintiff has got to set forth with respect to pleading a false claims act. Here, there is no specific allegation that deal with the question of materiality. Let me go to that case first. That was the Escobar case. The Escobar case specifically requires a specific representation about the goods or services. We don't have that here. What we do have that purports to pass for that are the words ITAR controlled. Those are not allegations. The allegations of the complaint don't suggest that that was the specific representation upon which this claim is based. That comes up only on appeal. What do those words mean, ITAR controlled? It's not clear at all. The obvious and common sense interpretation of the words ITAR controlled, which, by the way, are not in the invoice. They're in the packing slip. You can see from the record on appeal. They're in the packing slips, not on invoices. The common sense interpretation of that is that when you receive these products and you see in the packing slip it says ITAR controlled, it's like the word hazmat on the back of a truck. Be careful. These are products that you need to be mindful of, ITAR controlled. It is not a specific representation with respect to compliance with ITAR. There is no regulation that specifically says that compliance with ITAR with respect to a contractor dealing with a prime contractor who's also dealing with, who's then dealing with the government, must comply with ITAR in order to get paid. Indeed, the government regulations set out a meticulous regime with respect to what the government does. The government encourages voluntary compliance because ITAR is a complicated subject. It is something that is dealt with with many, many different products or services. The government receives voluntary submissions all of the time. And what the government does, if they're serious, yes, they can debar a contractor. They didn't debar anybody here. They can suspend a contractor. They did not do that here. They can have the power to suspend payments. They did not do that here. So opposing counsel says had the government known the extent of the disclosure, they would have disbarred this contractor and that they can amend their complaint to say that, that the disclosure, that the information that was given by MicroSemi to the government was incomplete. They said only three contract, three foreign nationals had access and none of them viewed it. And they allege that's erroneous. Yes, Your Honor, and I submit that this does not even come close to the who, what, where, how, when, and why that is required for pleading a false claims act. They can say we would have alleged this or we would have alleged that. The government was actually involved in the conversations. It's alleged in the complaint. There was a lot of back and forth between the government, the relator here, and the individuals at MicroSemi which are disagreeing with the interpretation of the contract. And under Safeco and under Hopper and under Haygood, disagreements with respect to the meaning of the requirements do not establish the scienter necessary to proceed with a false claims act. But why shouldn't they be allowed to amend their complaint? In the first place, that judgment by the district court, and the district court's 40-page decision shows how meticulous. She examined the evidence and the pleadings, and she specifically concluded it would be futile to amend the complaint. As this Court said in Serco, the party there does not identify the additional evidence. Just the conclusory allegations will not cut it. You just can't say, well, we would have alleged all of these other things. This is not something that was on the Internet. I don't even know where that comes from. It wasn't in the pleadings below. There's no evidence to support that. There's no plausible allegations that that happened. This was servers between affiliated companies, and there's no evidence, and the government was aware of what was happening. The government severed the contact with the servers because the government was involved. So what Escobar says is the materiality standard is rigorous. It's very important. It has to be pleaded particularly, and the fact that the government was aware, because of the voluntary submissions which are pleaded in the complaint of what was going on and did not inhibit the payment of these invoices, which did not contain the words ITAR control, is not what the Supreme Court said in a unanimous decision in Escobar, is that that is very strong evidence of the lack of materiality. That's a very significant thing. And then in Serco, which this Court decided shortly after the Escobar case, it basically said it's a matter of law. It is essentially pretty close to saying it's a matter of law where that occurs. But the main thing here is that there's no evidence that there was any significant impact on the government's decision to pay the invoices about the business with respect to ITAR. It's not a condition of payment, although that is under Escobar. That is not an express condition of payment. It's not required. It's certainly relevant that there wasn't. So I do distinguish EBED. The EBED case, E-B-E-I-D, Ex Rel. Longwoods, which says if the complaint provides relevant indicia that lead to a strong inference that claims were actually submitted, that that would be sufficient. Yes. And I think that in the first place, this complaint doesn't live up to the standards set by that case. Secondly, Escobar and Serco comes along after that. And there's also the element of, because there's no evidence here that it would have been a factor by the government with respect to paying these claims. The government has this regime. It's important for contractors to be able to work with the government with respect to these things, because there may be ambiguities. And here, I don't think there's any ambiguity. What the prohibition is, is export. All the plaintiff is able to allege here is access or exposure. The opposing counsel says that, with respect to Sienter, that it was the government's insistent interpretation of those ETA regulations that mere access to unauthorized persons was enough to violate the ETA requirements. I respectfully disagree. The the what the my opponent says that it mentions that at two particular cases where that is in a government, there's something like that, nothing like this, of course, is in the government's brief. It was never accepted by either of those two cases. The Stagg case, which comes along most recently from the Second Circuit, was subject to a 28J letter, and we responded to that. The court in the Second Circuit didn't, in the remotest, adopt that position. But it's like this. It's not in the regulations. It says, and the court below looked at this very carefully. She said export would be to a foreign person. Just making something available to somebody accessible to protected people within the company is not access or exposure or export to a foreign person. There's nothing in a regulation that describes it that way. It's not in the allegations of the complaint. All it said is ITAR controlled. It doesn't say we complied with ITAR because compliance with ITAR is a very complicated thing, and there can be technical violations. There can be ambiguities. But my opponent says this is the government's consistent position. It's not in a regulation. It's not in the statute. It's never been held to be the case by a court. And if you look at the, as we respectfully ask you to do, is look at the Safeco decision where the court was looking at allegations that were confusing with what was required as a matter of law. The court specifically says that does not amount to the type of scienter that is required. Indeed, what this court says in the Hopper case and the Haygood case is that when we're talking about willfulness, recklessness, we're talking about something that approaches an intentional, palpable lie, not differences in interpretation of a statute, not a dispute with respect to a legal issue. And the allegations of the complaint make it very clear that the micro-semi people did not agree with the interpretation of Mr. McGrath with respect to what ITAR required. The government then came in and became somewhat of an arbiter here, severed the connection between the servers, did not cut off the payments, did not suspend any money, did not debar anybody. There's no language of any sort with respect to that. And you ask about amending the complaint. In the first place, as what you said, the court said in your Serco decision, which is a decision of this year, Kelly does not identify the additional evidence that the district court failed to consider, nor does he explain why failing to consider such evidence resulted in error. We have noted previously that we will not consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief. This was not only not before the district court, but it was not in appellant's opening brief. So for all of these reasons, the complaint does not even come close to alleging with respect to the requirement of a specific, identifiable standard, a violation of a regulation. There's no clarity with respect to a violation of a regulation. There's the plaintiff's argument. And the plaintiff says, well, we may decide to allege all kinds of different things, but that does not pass the test for particular pleading required by 9b and pleading with plausibility required by Federal Rules of Civil Procedure 8a. It doesn't meet the standard in the Escobar or Serco case remotely with respect to materiality. And then with respect to Sienter, the most that you have here is that the plaintiffs, after the fact, and not in the district court argument, that ITAR controlled means compliance with ITAR. And you can't overcome the fact that compliance or not compliance with ITAR is not necessarily something that was a condition of payment by the government, not Raytheon. In the latest brief, in the rebuttal brief, the relator makes the argument that it may have had something to do with Raytheon's payment or not. That's a prime contractor. That's not the test. It must be a false submission to the government, the government meaning the government of the United States. But it even wasn't false with respect to Raytheon. The entire case is built upon this phrase, ITAR controlled, which is an afterthought. It was not the argument presented to the district court in the form of a complaint or arguments to the district court. The district court was very, very careful here. I don't think you see that very often. She meticulously went through all of the allegations. She meticulously thought about whether or not the express provision, the express claim was waived or not, and it clearly was. And she incorporated the things in the complaint, which, as you decided in the Ritchie case, is entirely appropriate, looked at all of the allegations, determined that the standards were not met in any respect with respect to this. And she didn't have before any express, particular, clear, plausible allegations that would have been added to the complaint. A lot of this, even to the extent that there's arguments about it, come along in the briefs in the court of appeals, not before the district court. But there is enough, on the record, for you to know that there wasn't cyanter under the standards of Escobar or Serco or the Safeco decision of the United States Supreme Court or Hopper or Haygood. So that doesn't meet that test. It does not remotely meet the materiality test if it's very strong evidence that there is not a material violation when the government is aware of the facts, which they were under these voluntary submissions, and went ahead and paid the claim. But there isn't an allegation of a violation of ITAR, which is clear in any event. So I could go on and on, and I know that time will not permit it, but there is no aspect of the Federal False Claims Act that has been adequately and appropriately pleaded here, and the district court was completely correct in dismissing and not permitting an amendment. Thank you. Thank you, Your Honor. Your Honor, the defendant says that in the complaint below and in the briefing below, the ITAR-controlled issue was not made a big issue. Well, it's attached to the complaint and Escobar hadn't been decided, which is why we should be allowed to amend. Escobar now says that at least where there's an express representation, and we say that is an express representation, the defendant argues facts and says that ITAR-controlled isn't a representation. Well, we should be able to prove through discovery that it is a representation, and that's why we should be allowed to end to comply with Escobar. We will allege that it is material to payment because of all the conditions and all the contracts and all the regulations that say you have to do this. Secondly, we have the excluded parent agreement, which is alleged in the complaint, where Microsemi said they told the government expressly that they would wall off the President because he lied to the Defense Department in order to get these contracts. I didn't see that in the record. Was the excluded parent agreement in the record? Because it wasn't clear to me what it said or how it was relevant. It is. It's alleged in the complaint. Our brief cites the specific paragraph. I don't have it in my mind right now. But it is in our brief, and it is alleged in the complaint. It's referenced specifically that Mr. McGrath said, why is this being uploaded to Microsemi? We have an excluded parent agreement. And what was the specific language, and how was that material to payment? It was not clear to me, either in your brief or in the ---- Our argument is that it was a fraudulent inducement claim because unless they had the excluded parent agreement, Microsemi could not do these contracts. WEDC had these contracts. They were bought by Microsemi. Microsemi could not continue to sell these products to the government without excluding Microsemi executives from the ITAR and EAR information. They specifically signed an agreement that they would not give access to the President, and they did. And it's alleged expressly in the complaint that they ignored it. It's also alleged ---- All the contracts. And there's a disk that was ---- All the contracts? Because there were contracts, I assume, before Microsemi acquired the WEDC. And so it would only have to be, I guess, contracts acquired afterwards? And do you allege those? What's the story on that? Yes. Submitted with the complaint is a disk in the district court that lists 2,500 separate shipments made from April 2010 to 2011, and they list the specific contracts that were made and good shipped that were ITAR violations. That were after the excluded parent agreement? Yes. That were shipped or that a contract was entered into after? Both. Both. The contract ---- well, the date of the contract I don't think is ---- we're going to need discovery to find the actual date. But we know that they shipped and we know that they sold products to Raytheon that had the ITAR information. And we know that during the period of time when all those products were sold to Raytheon and other main contractors, they had been violating the agreement. If I could make one more point, Your Honor, my adversary says that there's no evidence of scienter. There's several paragraphs that recount in detail the scienter. The easiest one is, A, lying on the excluded parent agreement, but also they specifically lied to the relator. They said, oh, yes, the Israeli domain administrator, he shouldn't have gotten it. He shouldn't have gotten the information. He's been turned off. Well, the relator went back and 15 minutes later they had turned it back on. They were lying the entire period of time. We can demonstrate that. If you give us a chance to amend our complaint, we'll articulate even better. But clearly there's enough evidence in this complaint to get the discovery to show that McGrath v. Microsemi had no good faith belief that they were following these regulations. Thank you. I think we have your argument. The case of McGrath v. Microsemi is submitted. And we're adjourned for this morning.
judges: D.W. Nelson, Ikuta, Burgess